UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                                    Crim. No. 2:13-cr-14-4

Chandara Sam

## REPORT AND RECOMMENDATION
(Doc. 426)

Chandara Sam, proceeding *pro se*, has moved under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence imposed on him in this district following his plea of guilty to one count of engaging in a conspiracy to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). (Doc. 232.) On January 13, 2014, United States District Judge William K. Sessions III sentenced Sam to a term of imprisonment of 168 months, to be followed by a four-year term of supervised release. (Doc. 231.)

Sam now asserts that he received ineffective assistance of counsel prior to his plea of guilty and at the time of sentencing, in violation of the Sixth Amendment to the United States Constitution. (Doc. 426-3 at 2, 9.) Sam's main contention is that his attorney failed to adequately provide him with correct legal advice regarding the effect certain sentencing enhancements under the advisory United States Sentencing Guidelines (USSG) would have on his sentence both prior to entering into the Plea Agreement and prior to sentencing. (*Id.*) For the reasons set forth below, I recommend that Sam's § 2255 Motion (Doc. 426) be DENIED.

## Background

### I.    Preliminary Proceedings

On April 11, 2013, a Criminal Complaint was filed charging Sam with "knowingly and intentionally distributing a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance," in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (Doc. 1.) Prior to his initial appearance, the Court appointed the Federal Public Defender (FPD) to represent Sam. (Doc. 5.) Sam was represented by Assistant FPD (AFPD) Barclay Johnson at his initial appearance. (Doc. 6.) Then, on April 25, 2013, AFPD David L. McColgin became Sam's attorney of record. (Doc. 10.)

That same day, the Grand Jury issued a First Superseding Indictment, which included charges against Sam and his eight codefendants. (Doc. 47.) Sam was charged with three of the eight counts in the Indictment: Count One, conspiring to distribute "100 grams or more of a mixture and substance containing a detectible amount of heroin," in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B), (*id.* at 1–2); Count Two, "knowingly and intentionally distribut[ing] a mixture and substance containing a detectible amount of heroin [on or about April 10, 2013]," in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), (*id.* at 3); and Count Four, "knowingly and intentionally distribut[ing] a mixture and substance containing a detectible amount of heroin [on or about May 14, 2012]," in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), (*id.* at 5).

On May 1, 2013, AFPD McColgin filed a Motion to Withdraw as Sam's attorney because McColgin had become aware of a conflict of interest between Sam and "a former

2:13-cr-00014-wks     Document 434     Filed 12/08/16     Page 3 of 40

client of the Office of the Federal Public Defender." (Doc. 61 at 1.) The Court granted McColgin's Motion the next day, and appointed Attorney John-Claude Charbonneau as Sam's attorney of record. (Doc. 62.) Sam was arraigned and entered a plea of not guilty on May 3, 2013. (Doc. 63.)

## II.   Plea Agreement

With the benefit of counsel, Sam entered into a Plea Agreement on July 23, 2013. (Doc. 131.) Specifically, Sam agreed to plead guilty to Count One which charged him with "conspiring to distribute 100 grams or more of heroin in Vermont from about the Spring of 2011 through April 10, 2013, in violation of 21 U.S.C. §§ 846, 841(a)(1), [and] 841(b)(1)(B)." (*Id.* at 1, ¶ 1.) As part of his agreement with the government, Sam stipulated that "the offense of conviction involved at least 700 grams of heroin and the distribution of that drug quantity during the course of the conspiracy was reasonably foreseeable to him." (*Id.* at 3, ¶ 8.) Sam further agreed to forfeit his 2009 Honda Accord as part of the Agreement. (*Id.* at 1–2, ¶ 3.)

Sam acknowledged in the Plea Agreement that by his plea of guilty to Count One, he faced a mandatory minimum term of imprisonment of five years up to a maximum of 40 years. (*Id.* at 1 (citing 21 U.S.C. § 841(b)(1)(B)).) He also acknowledged that any estimates or predictions relative to the Guidelines calculations were not binding on the Court, and that any erroneous estimates or predictions regarding his sentence made by his attorney would "not provide grounds for withdrawal of his plea of guilty, modification of his sentence, or appellate or post-conviction relief." (*Id.* at 4, ¶ 12.)

Later that day, Sam appeared before Judge Sessions for a change of plea hearing. (Docs. 132, 142.)  The record reveals that Judge Sessions engaged in the complete colloquy required by Fed. R. Crim. P. 11 to assure that Sam's Plea was a voluntary and knowing plea.  Judge Sessions first ascertained that Sam was not under the influence of any drugs or alcohol, or in any other way unable to "freely and voluntarily enter a plea." (Doc. 142 at 4:6–18.)  Sam stated that he "had an adequate opportunity to go over the[] charges" against him with Attorney Charbonneau and that he was "satisfied with the representation [Charbonneau] ha[d] provided."  (*Id.* at 4:25–5:5.)  Judge Sessions then explained to Sam his constitutional rights, and Sam stated that he understood he was waiving those rights by pleading guilty.  (*Id.* at 6:14–23.)  Sam further stated that no one had threatened or coerced him into pleading guilty.  (*Id.* at 8:4–6.)

Judge Sessions then proceeded to review the Plea Agreement with Sam.  (*Id.* at 8–11.)  Sam agreed that the summary outlined by Judge Sessions was consistent with his understanding of the Plea Agreement.  (*Id.* at 11:1–3.)  Sam stated that he had reviewed the Sentencing Guidelines with Attorney Charbonneau and that no one, including Charbonneau, had "made any promises or predictions as to what sentence [Sam was] likely to receive."  (*Id.* at 11:8–14.)  Furthermore, Sam acknowledged that the Sentencing Guidelines are advisory in nature and that "the court ha[d] the power to impose a sentence that [wa]s more severe or less severe than" the sentence called for by the Sentencing Guidelines.  (*Id.* at 11–12.)

After inquiring into whether the imprisonment range under the Sentencing Guidelines would satisfy the mandatory minimum sentence required under 21 U.S.C. §

841(b)(1)(B), Judge Sessions requested the government provide a brief statement of facts to determine if there was a factual basis for the guilty plea. (*Id.* at 14–15.) The government stated that Sam had sold over 100 grams of heroin in Vermont from the spring of 2011 through April of 2013. The prosecutor described two controlled buys of a combined 48 grams of heroin by law enforcement from Sam and the subsequent seizure of another 30 grams of heroin and over $40,000 cash from Sam's residence in Lowell, Massachusetts. (*Id.*) Sam confirmed the facts as laid out by the government were true. (*Id.* at 15:8–10.) Judge Sessions accepted Sam's guilty plea, finding that it was entered into "freely and voluntarily, with a full understanding of the nature of the charges and rights that [he was] waiving." (*Id.* at 15:17–24.) Finally, Judge Sessions ordered the completion of a presentence investigation report (PSR) and set sentencing for December 23, 2013. (*Id.* at 16) The sentencing hearing was later rescheduled to January 13, 2014. (Doc. 185.)

## III.    The Presentence Report

A PSR was prepared by the United States Probation Office and submitted to the Court in anticipation of sentencing. The PSR concluded that Sam faced an advisory Guidelines imprisonment range of 262 to 327 months, based on an adjusted offense level of 35 and a criminal history category (CHC) of 40. (PSR at 26, ¶ 132.) This sentencing range was determined using the 2013 USSG Manual. (*Id.* at 15, ¶ 76.) Sam received a base offense level of 30, because, consistent with Sam's stipulation, "[t]he offense involved a heroin quantity of at least 700 grams but less than 1 kilogram." (*Id.* at 16, ¶ 77 (citing USSG § 2D1.1(c)(5)).) Six levels were then added to the base offense level

because Sam possessed a firearm during the offense conduct (two levels) (*id.* ¶ 78 (citing USSG § 2D1.1(b)(1))); he used violence during the offense conduct (two levels) (*id.* (citing USSG § 2D1.1(b)(2))); and Sam "committed the offense as part of a pattern of criminal conduct engaged in as a livelihood" (two levels) (*id.* at 17, ¶ 78(citing USSG § 2D1.1(b)(14)(E))). He also received an additional two levels for his role as an "organizer, leader, manager, or supervisor" of others also engaged in the offense conduct, which brought his adjusted offense level to 38. (*Id.* at 18, ¶ 80 (citing USSG § 3B1.1(c)).) Three levels were then deducted from Sam's adjusted offense level, because he accepted responsibility (two levels) (*id.* ¶ 84 (citing USSG § 3E1.1(a))), and he "assisted authorities in the investigation of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty," (one level) (*id.* ¶ 85 (citing USSG § 3E1.1(b))).

Sam received eight criminal history points for three prior offenses. (*Id.* at 19–21.) Two points were then added, because Sam "committed the instant offense while under a criminal justice sentence." (*Id.* at 21, ¶ 93 (citing USSG § 4A1.1(d)).) This criminal history score of 10 points resulted in a CHC of V. (*Id.* ¶ 94.) As stated above, an adjusted offense level of 35 and the CHC of V resulted in a guideline imprisonment range of 262 to 327 months. (*Id.* at 26, ¶ 132.)

## IV.    Sentencing

Both parties filed Sentencing Memoranda responding to the recommendations provided in the PSR. (Docs. 228, 229.) In his Memorandum, Attorney Charbonneau opposed the adjusted offense level in the PSR and sought a downward departure. (Doc.

228.)  He opposed the adjusted offense level of 35 in the PSR, arguing that the USSG §§ 2D1.1(b)(14) and 3B1.1(c) enhancements did not apply to Sam's case.  Pointing to the evidence that indicated Sam's brother, Bunthan Sam, played a larger role in the conspiracy than Chandara Sam, Charbonneau argued that the facts did not support the finding that Sam played a "leadership role in the offense" conduct under USSG § 3B1.1(c).  (*Id.* at 5–7.)  He also asserted that the USSG § 2D1.1(b)(14) enhancement also did not apply to Sam's case, because a leadership role adjustment under USSG § 3B1.1 is a prerequisite to the application of a USSG § 2D1.1(b)(14) enhancement for a pattern of criminal livelihood.  (*Id.* at 7.)  Therefore, Charbonneau argued that the adjusted offense level should have been 31 and not 35.  (*Id.*)

Charbonneau also asserted that a downward departure was appropriate in Sam's case, because Sam's CHC was overstated by a 13-year-old conviction for carrying a pistol without a permit.  (*Id.* at 7–8.)  The PSR revealed that on June 4, 2001, Sam was arrested in Connecticut for carrying a pistol without a permit.  (PSR at 19, ¶ 90.)  For this offense, Sam received either a deferred or "diversionary sentence," which he then "violated 1 month shy of completion by his May[ 2], 2003 arrest."  (Doc. 228 at 8.) USSG § 4A1.2(e)(2) requires the counting of prior sentences of less than a year and one month if they were "imposed within ten years of the defendant's commencement of the instant offense."  USSG § 4A1.2(e)(2).  Charbonneau argued that the only reason that the 2001 offense was countable under the Sentencing Guidelines was because of a three-and-a-half-year delay in sentencing that arose because of Sam's violation of his deferred

sentence agreement.  (Doc. 228 at 8.)  This unusual delay, Charbonneau argued,

warranted a departure from the Sentencing Guidelines.  (*Id.*)

Charbonneau argued in the alternative that if Sam's first offense was to be

counted, Sam should have only received one point for the conviction (*see* USSG §

4A1.1(c)), because his sentence for that offense was imposed at the same time as his

sentence for a third conviction and set to run concurrently to that conviction.  (Doc. 228

at 8.)  Attorney Charbonneau contended these events caused Sam to sustain a criminal

history score of eight points, when he should have received only seven.  (*Id.*)  The one

point difference bumped Sam from a CHC of IV to V and resulted in greater sentencing

exposure.  (*Id.* at 9.)

The government, in its Memorandum, requested that the Court impose the

Guidelines sentence of 262–327 months' imprisonment as recommended in the PSR.

(Doc. 229 at 7.)  Prior to the sentencing hearing, Sam filed a Statement Regarding the

Presentence Report in which he stated that he had been provided with a copy of the PSR

by Attorney Charbonneau.  (Doc. 230.)  Sam stated further that he had an opportunity to

discuss the PSR with Charbonneau and that his objections to the PSR were "fairly

described" in the Addendum to the PSR, which was based on the arguments raised by

Charbonneau in his Sentencing Memorandum.  (*Id.*)

At sentencing, on January 13, 2014, Charbonneau brought to the Court's attention

that Sam wanted to obtain new counsel and the opportunity to "explore withdrawal of his

guilty plea."  (Doc. 267 at 3:15–18.)  Sam's main contention was that Charbonneau had

misled him by not making it clear prior to entering into the Plea Agreement that he would be subject to "enhancements" under the USSG for his prior convictions, for his role in the charged offense, and for possessing a gun during the charged offense. (*Id.* at 4–5.) Judge Sessions denied Sam's request, stating:

> At the time of the change of plea, I went through the plea colloquy closely with Mr. Sam, knowing full well that he was facing a potential significant sentence. I made sure that, first of all, he was satisfied with the representation that was being provided by Mr. Charbonneau. We went through all of the issues about whether other promises or recommendations were made to him; they clearly were not. . . . Based upon that, I find that there is no prejudice by continuing . . . and there's no justification for the withdrawal of the guilty plea.

(*Id.* at 8–9.)

The Court then conducted an evidentiary hearing on the objections to the PSR. (*Id.* at 9–10.) The government called Edward Chavin, one of the codefendants, as a witness to establish that Sam did in fact act in a leadership capacity during the offense conduct. (*Id.* at 11–12.) As stated above, Attorney Charbonneau contested that Sam played a leadership role in the offense, and therefore, argued that the role enhancement and the criminal livelihood enhancement should not apply. Although the Court found Chavin's testimony "credible in many ways about the existence of the conspiracy," it did not find the testimony presented "sufficient evidence to say that [Sam] had a management role or that he had a supervisory role over" Chavin for purposes of imposing the role enhancement. (*Id.* at 66:23–67:4.) Judge Sessions determined that he could not apply the criminal livelihood enhancement, because the role enhancement is a prerequisite to the

applicability of the criminal livelihood enhancement.  (*Id.* at 67:5–7.)  This resulted in a

reduced offense level of 31.  (*Id.* at 69:1–2.)

Turning to the CHC, the Court found the CHC of V recommended in the PSR

"appropriate" (*id.* at 68:24–25), and that a downward departure was not warranted,

because the offense conduct was "so serious and outrageous," (*id.* at 68:6–7.)  The Court

concluded that the revised Sentencing Guidelines range yielded a sentencing exposure of

168–210 months, based on a total offense level of 31 and a CHC of V.  (*Id.* at 69:1–3.)

After weighing the sentencing factors set forth in 18 U.S.C. § 3553(a) and the arguments

for a variance advanced in Sam's Sentencing Memorandum, the Court determined that a

variance was not warranted and that the appropriate sentence was 168 months'

imprisonment.  (*Id.* at 69:11–13.)

## V.    Direct Appeal

Sam, through Attorney Charbonneau, filed a Notice of Appeal on January 15,

2014, challenging his sentence.  (Doc. 233.)  On February 5, 2014, Charbonneau filed a

Motion to Withdraw and for Appointment of CJA Counsel with the Second Circuit Court

of Appeals, because Sam "desired to raise an ineffective assistance of counsel claim on

appeal."  (Doc. 432 at 9–10; Doc. 432-2.)  New counsel was appointed pursuant to the

Criminal Justice Act.  After reviewing Sam's case, his new attorney, Peter Tomao,

concluded that there were "no meritorious or non-frivolous issues to raise on appeal."

Brief for Defendant-Appellant at 4, *United States v. Chavin*, No. 14-278-cr (2d Cir.

2014), ECF No. 26.  This conclusion led Tomao to file a brief pursuant to *Anders v.*

*California*, 386 U.S. 738 (1967),[1] *id.*, and a Motion for Withdrawal as Counsel, *id.*, ECF No. 25.  The government subsequently filed a Motion for Summary Affirmance.  *Id.*, ECF No. 35-1.

Once an attorney has filed an *Anders* brief, as Tomao did in this case, the court decides based on the record of the proceedings and the *Anders* brief "whether the case is wholly frivolous."  *Campusano v. United States*, 442 F.3d 770, 774 (2d Cir. 2006) (quoting *Anders*, 386 U.S. at 744).  If the court determines that the case is frivolous, then "it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if state law so requires."  If, however, the court finds "any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal."  *Id.*  Having considered the record and reviewed Tomao's *Anders* brief, the United States Court of Appeals for the Second Circuit granted Tomao's Motion for Withdrawal, granted the government's pending Motion for Summary Affirmance, and dismissed the appeal on October 10, 2014.  (Doc. 388.)

Almost a year later, on August 11, 2015, Judge Sessions issued an Order pursuant to 18 U.S.C. § 3582(c)(2) to reduce "the term of imprisonment imposed based on a guideline sentencing range that ha[d] subsequently been lowered and made retroactive by

---

[1]  When attorneys "believe their client's appeal would be frivolous [they] are required to file a brief in compliance with *Anders v. California*, 386 U.S. 738 (1967)."  *Campusano v. United States*, 442 F.3d 770, 774 (2d Cir. 2006).  This brief, now known simply as an "*Anders* brief" must be filed with the court and delivered to the defendant, contain a request to withdraw as counsel, and "refer[] to anything in the record that might arguably support the appeal."  *Id.* (quoting *Anders*, 386 U.S. at 744).

the United States Sentencing Commission pursuant to 28 U.S.C. § 994(u)."  (Doc. 422.)

The Order lowered Sam's sentence from 168 months to 140 months.  (*Id.*)

## VI.    Sam's § 2255 Motion

Sam now asserts in his § 2255 Motion that he received ineffective assistance of

counsel.  Sam makes two substantive arguments in his Memorandum of Law.  (Doc. 426-

3.)  First, he states that Attorney Charbonneau erroneously advised him "that his sentence

would be 72 months if he entered a plea of guilt[y]."  (*Id.* at 4.)  Sam claims that he relied

on this "erroneous legal advice in deciding to enter a plea of guilt[y]," (*id.* at 3), and

would have otherwise proceeded to trial (*id.* at 8; Doc. 426-4 at 3).  Second, Sam argues

that Charbonneau "failed to conduct a proper investigation into [his] prior conviction[s],"

when calculating his CHC for purposes of determining his sentence guideline range.

(Doc. 426-3 at 9–10.)  Sam claims this miscalculation resulted in Sam receiving a CHC

of V, when he should have received a CHC of IV.  (*Id.* at 11–12.)  Sam argues that this

resulted in a longer sentence than was warranted.  (*Id.*)

Charbonneau filed an affidavit responding to Sam's assertions on June 10, 2016.

(Doc. 432.)  Charbonneau states that he discussed Sam's potential sentence with him

throughout his representation and that they discussed how various factors could affect the

sentence Sam eventually received.  (*Id.* at 2, 4, 5, 6, 7, 8–9.)  According to Charbonneau,

at their first meeting, on May 3, 2013, Charbonneau advised Sam that Sam could face a

USSG range as high as 262–327 months or as low as 151–188 months "based upon [his]

limited knowledge of the Government's evidence and [his] cursory knowledge of [Sam's]

criminal record and the potential applicability of the USSG Career Offender provisions." (*Id.* at 2.)

Prior to entering into the Plea Agreement, but after Charbonneau had an opportunity to review the discovery, Charbonneau met with Sam again to discuss his estimate of Sam's sentencing exposure. (*Id.* at 5.) At that time, Charbonneau described different sentencing ranges Sam could face depending on the application of various enhancements. (*Id.*) According to Charbonneau, these ranges varied from a high of 135–168 months to a low of 87–108 months. (*Id.* at 5–6.) After reviewing the draft PSR in late November, Charbonneau told Sam that he was going to request "a variance sentence of 72 months," in the Sentencing Memorandum. (*Id.* at 7; Doc. 228 at 10.)

Later, when Charbonneau met with Sam on January 8, 2014, to prepare for the sentencing hearing he told Sam that he "was sure that [Sam] would not receive a sentence at, or even near, the PSR calculated range of 262 to 327 months." (Doc. 432 at 8–9.) Charbonneau states in his Affidavit that he "did not, however, assure [Sam] that [Sam] would receive the 72 month sentence [they] had requested." (*Id.* at 9.)

According to Charbonneau, he discussed with Sam the different factors that would be considered in the determination of Sam's likely sentencing exposure. (*Id.* at 2, 5–6, 7.) One of the factors that Charbonneau discussed with Sam was Sam's prior convictions and how those convictions would translate into a criminal history score that would be used to determine his CHC. (*Id.*) Charbonneau conceded at the sentencing hearing (Doc. 267 at 44), and again in his Affidavit that he initially miscalculated Sam's CHC, "based

upon [a] misapplication of [the] time period calculation rules, USSG [§] 4A1.2(e), and [the] consecutive/concurrent rules, [USSG §] 4A1.2(a)(2)." (Doc. 432 at 3–4.) Charbonneau explains in the Affidavit that prior to receiving the PSR he had estimated Sam's CHC would be III, based on Sam's criminal record. (*Id.*) The PSR concluded that Sam's CHC was V. (PSR at 21, ¶ 94.) After receiving the PSR and realizing that he had miscalculated the CHC, Charbonneau met with Sam to explain his miscalculations and how that impacted the sentence he would advocate for in the Sentencing Memorandum. (Doc. 432 at 7.)

A month after meeting with Sam to discuss the PSR, Charbonneau met with Sam again, this time to review the Sentencing Memorandum he had submitted. (*Id.* at 8.) At that time, Sam expressed "for the first time that he desired to withdraw his guilty plea because 'the numbers were too high.'" (*Id.*) Charbonneau explained to Sam the consequences of withdrawing his plea at that point in the process. (*Id.*) Charbonneau attempted to dissuade Sam from withdrawing, because if Sam was permitted to withdraw from his plea and was convicted at trial, "the USSG calculations would very likely increase, not decrease." (*Id.*) Charbonneau reasoned that Sam's sentencing range would likely increase if he withdrew his plea because (1) Sam could lose the acceptance of responsibility offense level reductions, (2) he could be charged with distributing even greater quantities of drugs, and (3) he could face exposure to other charges based on the two firearms recovered during the investigation. (*Id.*)

<u>Discussion</u>

## I.    Legal Standard: § 2255 Motion

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence if he can show that his sentence (1) was imposed in violation of the Constitution or laws of the United States, (2) was issued by a court that did not have jurisdiction, (3) was in excess of the lawful maximum, or (4) "is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  This means relief under § 2255 "is generally available . . . only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice."  *Cuoco v. United States,* 208 F.3d 27, 30 (2d Cir. 2000) (internal quotation marks omitted) (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)).

## II.    Sam's § 2255 Motion is Time-Barred

### A.    Timeliness Under 28 U.S.C. § 2255(f)(1)

The government argues that Sam's "petition should be dismissed as time-barred." (Doc. 433 at 1.)  A § 2255 petitioner has one year from "the date on which the judgment of conviction becomes final" to file a petition for post-conviction relief.  28 U.S.C. § 2255(f)(1).  Sam's conviction became final 90 days after the Second Circuit dismissed his appeal.  *See Clay v. United Sates*, 537 U.S. 522, 525 (2003) ("For the purpose of starting the clock on § 2255's one-year limitation period . . . a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction."); Sup. Ct. R. 13 ("a writ of certiorari . . . is timely

when it is filed with the Clerk of th[e Supreme] Court within 90 days after entry of the

judgment" of the appeals court).  The Second Circuit dismissed his appellate claim on

October 10, 2014.  (Doc. 388.)  Sam did not file a petition for certiorari, which means his

conviction became final on January 8, 2015, when the period to seek certiorari expired.

Therefore, Sam had until January 8, 2016, to file a § 2255 Motion.  Sam filed his § 2255

Motion on April 7, 2016.  (Doc. 426.)  Sam's Motion, therefore, is time-barred because it

was filed almost three months after the statute of limitations expired.

Finally, the fact that Sam later benefitted from a sentence reduction pursuant to the

authority of 18 U.S.C. § 3582(c)(2) does not change the analysis.  It is well settled that a

§ 3582(c)(2) sentence modification, whether granted or denied, does not restart the §

2255(f)(1) limitation period.  *See United States v. Preyear*, Nos. 10–0280–KD; 05–267–

KD–N, 2010 WL 4026087 at *1–2 (S.D. Ala. Sept. 22, 2010).  Title 18 § 3582(b) makes

it clear that, notwithstanding the fact that a sentence may be subject to modification under

§ 3582(c)(2), "a judgment of conviction that includes such a sentence constitutes a final

judgment for all other purposes." *United States v. Dixon*, Nos. 99–525–03; 09–1606,

2009 WL 1559947 at *3 (E.D. Pa. June 3, 2009).  *See Gomez v. United States*, Nos. 3:09–

CV–0073–G; 3:04–CR–253(03)–GECF, 2009 WL 1309338 at *2 (N.D. Tex. May 11,

2009) (order reducing sentence pursuant to § 3582(c)(2) "did not alter the date on which

[the] judgment of conviction became final under § 2255(f)(1)").

## B.    The Doctrine of Equitable Tolling

Sam seeks to overcome the statute of limitations hurdle by relying on the doctrine

of equitable tolling.  (Doc. 426-1 at 2–3.)  Equitable tolling of a statute of limitations is

16

warranted only in "rare and exceptional circumstances." *Baldayaque v. United States*, 338 F.3d 145, 151 (2d Cir. 2003) (quoting *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir. 2001)).  The petitioner must "show '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.'" *Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  When determining whether a circumstance is "extraordinary" a court should focus its inquiry "not [on] how unusual the circumstance alleged . . . is among the universe of prisoners, but rather how severe an obstacle it is for the prisoner endeavoring to comply with [the] limitations period." *Rabbani v. United States*, 156 F.Supp.3d 396, 403 (W.D.N.Y. 2016) (second alteration in original) (quoting *Johnson v. United States*, No. 11–cv–4730 (ENV), 2014 WL 4545845, at *5 (E.D.N.Y. Sept. 12, 2014)).

The petitioner bears the burden "to demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000).  Regardless of how extraordinary a circumstance is, therefore, a court will only find equitable tolling warranted if the petitioner can show that he or she "exercised reasonable diligence in attempting to file after the extraordinary circumstance began." *Rabbani*, 156 F.Supp.3d at 404 (quoting *Baldayaque*, 338 F.3d at 150); *see Baldayaque*, 338 F.3d at 153 ("The presence of extraordinary circumstances is not enough . . . to justify the application of equitable tolling.")

17

In this case, Sam claims the court should equitably toll the statute of limitations for three reasons. First, Sam claims that he "has not received a copy of th[e] brief nor a decision from the Court of Appeals," regarding his direct appeal. (Doc. 426-1 at 1.) The Second Circuit has recognized that equitable tolling may apply in some instances where the petitioner has diligently sought information regarding the pendency of his or her appeal from the appeals court and demonstrated an actual lack of notice. *Diaz*, 515 F. 3d at 154–5. The district courts in this circuit, however, have found equitable tolling inappropriate where the petitioner "has presented no information as to when he expected to hear from the . . . Court of Appeals [and] what steps, if any, he took to learn the status of his . . . application." *Thrower v. Laird*, No. 06 Civ. 4864(JSR)(AJP), 2006 WL 3735649, at *2 (S.D.N.Y. Dec. 14, 2006) (collecting cases). Sam's case falls into this latter category. Sam has done nothing to demonstrate what steps, if any, he took to learn the status of his appeal. Furthermore, Sam concedes that he knew Attorney Tomao "would be filing an *Anders* brief." (Doc. 426-1 at 1.) Sam does not indicate that he was unaware of the purpose of an *Anders* brief or that Attorney Tomao failed to inform Sam what it was. Therefore, Sam should have, with reasonable diligence, been able to determine the status of his direct appeal. He should have been able to determine that his direct appeal had been dismissed, and if he had any doubt, it was on him to inquire with the Court of Appeals whether they had dismissed his appeal or not. Without proof that he actually inquired into the status of his appeal, Sam has failed to prove he pursued his rights diligently.

Second, he states that he was unable to file his § 2255 Motion prior to the running of the statute of limitations, because he was "locked in [his] cell for 22 hours a day, seven days a week." (Doc. 426-1 at 1–2.) This claim fails, because "the difficulties attendant on prison life, such as transfers between facilities, solitary confinement, lockdowns, restricted access to law library, and an inability to secure court documents, [generally] do not by themselves qualify as extraordinary circumstances." *Rivera v. United States*, 719 F. Supp. 2d 230, 234 (D. Conn. 2010) (alteration in original) (quoting *Corrigan v. Barbery*, 371 F. Supp. 2d 325, 330 (W.D.N.Y. 2005)) (holding that a delay caused by the prison mail system was not an extraordinary circumstance sufficient to invoke the doctrine of equitable tolling), *aff'd*, 448 Fed. App'x 145 (2d Cir. 2011). Sam's situation, therefore, does not warrant equitable tolling because it neither qualifies as rare nor exceptional.

Third, Sam contends his § 2255 Motion was filed after the running of the statute of limitations, because the prison legal assistant Sam sought out was not familiar with federal law and was unable to provide him with a § 2255 form and the address of the United States District Court for the District of Vermont. (Doc. 426-1 at 2.) In *Hamilton v. Warden of Clinton County Correctional Facility*, 573 F. Supp. 2d 779 (S.D.N.Y. 2008), the petitioner sought equitable tolling of the statute of limitations because an inmate law clerk had allegedly failed to file a state writ of error on his behalf. The court, in addition to failing to see how the state writ was relevant to his federal habeas petition, found this argument unpersuasive. The court held that the petitioner, like Sam, "had [the] ultimate responsibility for managing the preparation and timely filing of his habeas

petition, and neither his entrusting some aspect of it to another person, or his own

ignorance of the filing deadlines, constitute[d] sufficient 'extraordinary circumstances' to

warrant equitable tolling." *Hamilton*, 573 F.Supp.2d at 781.  Sam clearly has

demonstrated an understanding of the habeas process and has shown through the filing of

his own expansive Motion that he could have filed his Motion without the aid of a prison

legal assistant or a § 2255 form.  Again, Sam does not present an extraordinary

circumstance to warrant the application of equitable tolling.

### III.    Sam Waived His Right to Post-conviction Relief Regarding Estimates or Predictions of the Length of His Sentence

In its Memorandum in Opposition to Sam's § 2255 Motion, the government notes

that the Plea Agreement contained the following language:

> Chandara Sam fully understands that any estimates or predictions relative
> to the Guidelines calculations are not binding upon the Court.  He fully
> understands that the Guidelines are advisory and that the Court can
> consider any and all information that it deems relevant to the sentencing
> determination.  *He acknowledges that in the event that any estimates or
> predictions by his attorney (or anyone else) are erroneous, those erroneous
> predictions will not provide grounds for* withdrawal of his guilty plea,
> modification of his sentence, or for appellate or *post-conviction relief*.

(Doc. 433 at 5 (quoting Doc. 131 at 4, ¶ 12) (emphasis added); *see also id.* at 21

("Paragraph 12 of the plea agreement Sam signed also made clear that attorney

predictions are not binding on the Court and that erroneous predictions do not provide

grounds for withdrawal of guilty plea or post-conviction relief.").)  In the Second Circuit

"[a] defendant's knowing and voluntary waiver of the right to appeal or collaterally

attack his conviction and/or sentence is enforceable."  *Sanford v. United States*, Docket

No. 16–1840, 2016 WL 6608944, at *2 (2d Cir. Nov. 9, 2016) (citing *United States v.*

*Gomez-Perez*, 215 F.3d 315, 318 (2d Cir. 2000) (addressing waiver of appellate rights);

*Tellado v. United States*, 745 F.3d 48 (2d Cir. 2014) (addressing collateral attack

waiver)); *see also United States v. Hernandez*, 242 F.3d 110, 113 (2d Cir. 2001)

(enforcing knowing and voluntary waiver of right to appeal); *United States v. Salcido-

Contreras*, 990 F.2d 51, 53 (2d Cir. 1993) ("In no circumstance . . . may a defendant,

who has secured the benefits of a plea agreement and knowingly and voluntarily waived

the right to appeal a certain sentence, then appeal the merits of a sentence conforming to

the agreement."); *Garcia-Santos v. United States*, 273 F.3d 506, 509 (2d Cir. 2001)

(enforcing waiver of right to collateral attack under § 2255).  A waiver of either the right

to appeal or collaterally attack a sentence is not enforceable, however, "where the

defendant claims that the plea agreement was entered into without effective assistance of

counsel."  *Santana v. United States*, No. 04 Civ. 1111(SAS), 2005 WL 180932, at *3

(S.D.N.Y. Jan. 26, 2005) (quoting *Hernandez*, 242 F.3d at 113–14) ("[A] waiver of

appellate or collateral attack rights does not foreclose an attack on the validity of the

process by which the waiver has been procured." (quoting *Frederick v. Warden,

Lewisburg Corr. Facility*, 308 F.3d 192, 195 (2d Cir. 2002))).

    A petitioner who waived his right to collaterally attack his conviction and sentence

can overcome the waiver if he can show "(1) the waiver was not made knowingly,

voluntarily, and competently; (2) the sentence imposed was based on constitutionally

impermissible factors; (3) the government breached the plea agreement; or (4) the court

failed to enunciate any rationale for the sentence."  *Kahn v. United States*, 414 F. Supp.

2d 210, 217 (E.D.N.Y. 2006) (citing *Gomez-Perez*, 215 F.3d at 319); *see Sanford*, 2016

WL 6608944, at *2 (quoting *Gomez-Perez*, 215 F.3d at 319). The second, third, and fourth methods of overcoming a waiver provision are not present in this case. Sam has not claimed that his sentence was based on constitutionally impermissible factors; that the government breached the plea agreement; or that the court failed to justify his sentence. His sole contention is that he entered the guilty plea because of the erroneous advice of Attorney Charbonneau about the length of the sentence he would be facing. Such a contention alleges that Sam entered into the Plea Agreement and waived his right to collaterally challenge his sentence without knowledge of what was in the agreement.

A guilty plea and waiver provision must be the result of "a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Santana*, 2005 WL 180932, at *4 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Charbonneau states in his Affidavit that prior to Sam entering into the Plea Agreement he met with Sam to discuss Sam's three options. (Doc. 432 at 5–6, ¶¶ 8–9.) Charbonneau told Sam that he could either "enter a guilty plea pursuant to the Plea Agreement; enter a guilty plea to the Indictment without a Plea Agreement; or go to trial." (*Id.* at 5, ¶ 9.) Charbonneau explained the potential consequences of each option to Sam at that time, and that after hearing his options, Sam decided to enter into the Plea Agreement and plead guilty. (*Id.* at 5–6.) Thus, it appears that Sam voluntarily entered into the Plea Agreement with full knowledge of the consequences.

Any doubt in Charbonneau's Affidavit is undercut by the language in the Plea Agreement itself and the exchange between Sam and Judge Sessions at the change of plea hearing. In the Plea Agreement, Sam acknowledged that he is guilty, (Doc. 131 at 3, ¶ 7);

that he understood "the nature of the charges to which he will plead guilty and the

possible penalties," (*id.* ¶ 10); that "the sentence to be imposed on him is within the

discretion of the Court," (*id.* ¶ 11); and that he entered the "[A]greement of his own free

will, with full knowledge and understanding of the agreement and with the advice and

assistance of his counsel, Jean-Claude [sic] Charbonneau, Esq.," (*id.* at 7, ¶ 20).  Sam's

specific claim is further undercut by the fact that in the Plea Agreement Sam also attested

that:

> [H]e [wa]s fully satisfied with the representation provided by his attorney,
> Jean-Claude [sic] Charbonneau, Esq., and [that he] had full opportunity to
> consult with his attorney concerning this agreement, concerning the
> applicability and impact of the Sentencing Guidelines (including, but not
> limited to, the relevant conduct provisions of Guideline Section 1B1.3), and
> concerning the potential terms and conditions of supervised release.

(*Id.*)  At the change of plea hearing, while under oath, Sam stated that he had read the

Plea Agreement, that he had gone over it with Charbonneau, and that he had understood

it prior to signing it.  (Doc. 142 at 8:7–18.)  Sam also confirmed that there had not been

any promises or representations made by anyone to induce him into pleading guilty, (*id.*

at 11:4–7), nor "any promises or predictions as to what sentence [Sam would] likely . . .

receive, (*id.* 11–14).  *See Francisco v. United States*, 115 F. Supp. 3d 416, 421 (S.D.N.Y

2015) ("[A]ny allegations a defendant makes in a Section 2255 petition 'cannot overcome

his contrary statements under oath during a plea allocution, which must be given

presumptive force of truth.'") (quoting *Hernandez*, 242 F.3d at 112–13).  After Sam

stated that he understood the Sentencing Guidelines and that he had a chance to go over

them with Charbonneau (Doc. 142 at 11–12), the Court concluded that Sam was

"pleading guilty freely and voluntarily, with a full understanding of the nature of the charges and the rights that [he was] waiving," (*id.* at 15:21–24). When all of these events are taken together, it is clear that Sam voluntarily and knowingly entered into the Plea Agreement.

### A.  Sam Has Not Established that He Entered into the Plea Agreement and Accepted the Waiver Provision Because of the Ineffectiveness of His Attorney

Sam's first argument is that he entered into the Plea Agreement, because he believed that he would receive a sentence close to the incorrect estimate of 72 months made by Attorney Charbonneau. (Doc. 426-3 at 3–4.) According to Charbonneau the lowest possible sentence range he discussed with Sam prior to Sam's acceptance of the Plea Agreement was 87 to 108 months. (Doc. 432 at 6.) Charbonneau also states that prior to receiving discovery he had told Sam that the Court could impose a sentence range as high as 262 to 327 months. (*Id.* at 2.) After reviewing discovery, however, Charbonneau adjusted his high estimate down to a possible sentence range of 151 to 235 months. (*Id.* at 6.) No reference was made to a 72-month sentence until after Sam had pleaded guilty and they had received the PSR. Based on this timeline, Sam could not have relied on an estimate of 72 months in making his decision to enter into the Plea Agreement. *Santana*, 2005 WL 180932, at *5 (holding that to overcome the waiver provision in the plea agreement with a claim of ineffective assistance of counsel, petitioner would have had to have shown that his attorney had made the statement, which petitioner claimed persuaded him to enter the plea agreement, prior to the plea agreement "such that petitioner's waiver of his rights was somehow predicated on it").

24

Sam's first argument is similar to that advanced by the petitioner in *United States v. Djelevic*, 161 F.3d 104, 107 (2d Cir. 1998). In *Djelevic*, the Court noted that the defendant was trying to "dress up his claim as a violation of the Sixth Amendment," when "in reality [he wa]s challenging the correctness of his sentence under the Sentencing Guidelines, and [wa]s therefore barred by the plain language of the waiver contained in his plea agreement with the government." *Id.* Similarly, in *Santana*, the court held that a collateral attack "can be summarily dismissed," when a petitioner's claim of ineffective assistance of counsel is a mere pretext to avoid an express waiver of the right to collaterally attack a sentence that was made in the plea agreement. *Santana*, 2005 WL 180932, at *5. In this case, Sam "cannot carry his burden of showing ineffectiveness of counsel," because he has done nothing to show that his first argument is anything more than "a self-serving, *post hoc* assertion that contradicts a number of sworn, in-court statements." *Id.* I conclude that Sam's first argument was waived under the express terms of the Plea Agreement.

### B.    Sam's Second Argument is Barred by the Plain Language of the Waiver Provision in the Plea Agreement

In his second claim, Sam argues that he received a CHC higher than he should have, because Attorney Charbonneau "failed to conduct a proper investigation into [his] prior conviction in Connecticut." (Doc. 426-3 at 9–10.) This claim is barred by the plain language of the waiver provision in the Plea Agreement. The waiver provisions states "that in the event that any estimates or predictions by his attorney . . . are erroneous, those erroneous predictions will not provide grounds for . . . post-conviction relief."

(Doc. 131 at 4, ¶ 12.)  Here Sam is seeking post-conviction relief for Charbonneau's alleged error in predicting Sam's sentence.  The waiver provision was included in the Plea Agreement to prevent claims just like this.  Therefore, I recommend that the Court conclude that Sam's second claim is barred by his waiver.

## IV.    Ineffective Assistance of Counsel Claims

### A.    Standards Governing Ineffective Assistance of Counsel Claims

If the Court determines that Sam's claims are neither time-barred nor waived, then the Court should find that the claims are meritless.  Criminal defendants have "a Sixth Amendment right to the effective assistance of counsel at all critical stages of the prosecution where [their] substantial rights may be affected, and . . . sentencing is one such stage." *Janvier v. United States*, 793 F.2d 449, 451 (2d Cir. 1986).  To establish a claim of ineffective assistance of counsel, the petitioner must show (1) that his counsel was objectively deficient, and "(2) that he was actually prejudiced."  *Morales v. United States*, 635 F.3d 39, 43 (2d Cir. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 688, 692–93 (1984)).  The two-part *Strickland* test "applies to challenges to guilty pleas based on ineffective assistance of counsel."  *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see also Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014) (citing *Hill*, 474 U.S. at 58).

The petitioner bears the burden of proof and must establish each element of the two-part test.  *See United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) (citing *Strickland*, 466 U.S. at 687).  This burden is not easily met, because there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011) (quoting

*Strickland*, 466 U.S. at 689).  What constitutes "reasonable professional assistance," must be viewed in light of the law and circumstances confronting counsel at the time counsel represented the petitioner.  *See Parisi v. United States*, 529 F.3d 134, 141 (2d Cir. 2008).  With regard to *Strickland's* performance prong, the determinative question is not whether counsel "deviated from best practices or most common custom," but whether his "representation amounted to incompetence under prevailing professional norms." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).  With respect to *Strickland's* prejudice prong, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  The United States Supreme Court has held that in the context of guilty pleas, "to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial."  *Hill*, 474 U.S. at 59.

### B.    Misleading Information

Sam argues that if Attorney Charbonneau had not given him an erroneous estimate of what his sentence would be, he would have elected to proceed to trial.  (Doc. 426-3 at 3–8.)  The decision whether to enter into a plea agreement is "ordinarily the most important single decision in a criminal case . . . [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial decision."  *United States v. Gordon*, 156, F.3d 376, 380 (2d Cir. 1998) (alterations in original) (quoting *Boria v.*

*Keane*, 99 F.3d 492, 496–97 (2d Cir. 1996)).  For this reason, the "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Id.* (alteration in original) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)).

To establish ineffective assistance of counsel during plea negotiations the petitioner must show that "the counsel's deficient performance undermine[d] the voluntary and intelligent nature of defendant's decision to plead guilty." *United States v. Arteca*, 411 F.3d 315, 320 (2d Cir. 2005).  The burden is on the petitioner to show that he was not "aware of [the] actual sentencing possibilities," and that had he been aware of the "accurate information" he would not have entered into the plea agreement.  *Id.*  A claim based only on alleged "[e]rrors in counsel's predictions of a defendant's ultimate sentence under the Sentencing Guidelines generally do[es] not support a determination of ineffective assistance of counsel." *Pena v. United States*, 09-CR-0341 (VM), 09-CV-4261 (VM), 2016 WL 3659114, at *5 (S.D.N.Y. June 27, 2016) (citing *United States v. Sweeney*, 878 F.2d 68, 70 (2d Cir. 1989)).

In his first claim, Sam essentially argues that Charbonneau provided him with constitutionally ineffective assistance of counsel because Charbonneau failed to accurately estimate Sam's sentencing range prior to Sam entering the Plea Agreement and pleading guilty.  (Doc. 426-3 at 2.)  "Under *Sweeney*, counsel's statements regarding [defendant's] possible sentence cannot be the basis for an ineffective assistance claim, since any representations an attorney makes as to possible sentences are mere estimates." *Francisco*, 115 F. Supp. 3d at 422 (citing *Sweeney*, 878 F.2d at 70).  Sam's reliance on

*Pham v. United States*, 317 F.3d 178 (2d Cir. 2003) and *Gordon*, 156 F.3d 376 as support for an opposite conclusion is misplaced. Both *Pham* and *Gordon* dealt with petitioners who, unlike Sam, did not accept plea agreements and went to trial. *Pham*, 317 F.3d at 180–81; *Gordon*, 156 F.3d at 377.

In *Pham*, the petitioner, Pham, argued that he received ineffective assistance when his counsel "failed to inform him of the government's global plea offer." *Pham*, 317 F.3d at 182. After proceeding to trial and being convicted, Pham allegedly found out for the first time that his counsel had been presented with a plea offer that provided for a sentencing range with a high end of 113 months less than what he actually received after trial. *Id.* at 182–83. The Second Circuit held that such "a significant sentencing disparity in combination with defendant's statement . . . [that he would have accepted the plea offer] is sufficient to support a prejudice finding." *Id.* at 182. In Sam's case, there is no question that Sam was aware of the plea offer, because he accepted the plea offer.

The Court's holding in *Pham* was predicated on the fact that Pham's attorney failed to inform him of a plea offer, which provided for a significantly shorter prison sentence than Pham actually received after he was convicted at trial. The "significant disparity" identified in *Pham* was between two known sentencing possibilities. This is unlike Sam's case where the plea offer did not provide a sentence range and there was no way of knowing what his sentence would have been if Sam had proceeded to trial and been convicted. The reasoning of *Pham*, therefore, is inapplicable to Sam's case.

*Gordon* is similarly distinguishable to Sam's case. *Gordon* dealt with a defendant, Gordon, who proceeded to trial under the false assumption that 120-months'

imprisonment was the maximum sentence he would receive if he was found guilty. *Gordon*, 156 F.3d at 377–78. Prior to trial, Gordon was presented with a plea offer in which in exchange for his guilty plea, the government would offer Gordon a sentence of 84 months. *Id.* Gordon later claimed he proceeded to trial because he did not think there was much to lose with such a small difference between the two possible sentences. *Id.* at 378. After he was convicted at trial, however, Gordon received a sentence of 210 months, which was the low end of the Guidelines range. *Id.* The court held that Gordon's attorney's grossly inaccurate estimate of Gordon's sentencing exposure if convicted at trial was sufficient to satisfy the two-part *Strickland* test. *Id.* at 380–81. Unlike the defendant in *Gordon*, however, the record here reveals that Sam was made aware of his actual sentence exposure multiple times prior to agreeing to enter the Plea Agreement and plead guilty as discussed below. Because Sam was actually aware of his sentencing exposure, *Gordon* is not applicable to this case.

Under *Sweeney*, therefore, to the extent that Sam's ineffective assistance claim is construed as being solely based on Charbonneau's estimates of Sam's possible sentence, I recommend that the Court dismiss Sam's claim. *See Rivera v. United States*, 893 F. Supp. 1238, 1249 (S.D.N.Y. 1995) (finding petitioner's ineffective assistance claim based on counsel's estimates of petitioner's sentence without merit where "petitioner was informed of the statutory parameters of his sentence, understood that his sentence was within th[e] Court's sole discretion, and stated that no prediction or promises had been made to him as to what his sentence would be."); *Pena*, 2016 WL 3659114, at *5; *Clarke v. United States*, 117 F. Supp. 2d 134, 137 (D. Conn. 2000) ("[C]onclusory allegation that

[petitioner] pleaded guilty as a result of his attorney's incorrect prediction of sentence is subject to summary dismissal because it is unsupported and wholly incredible in light of the record.").

Assuming *arguendo* that Sam's claim is somehow not precluded by *Sweeney* and its progeny, Sam's claim remains meritless because it is clear that Sam was fully aware of his sentencing exposure.  Sam was aware prior to entering the Plea Agreement that he faced a sentence somewhere between the statutory "5-year mandatory minimum term of imprisonment" and the statutory maximum of 40-years' imprisonment.  (Doc. 131 at 1, ¶ 2.)  His awareness of this statutory sentence range is reflected in the fact that it was written into the Plea Agreement that Sam attested to having read and gone over with the aid of Attorney Charbonneau both in the Plea Agreement itself and at the change of plea hearing.  (Doc. 131 at 7; Doc. 142 at 5–6, 8.)

Additionally, in his Affidavit, Charbonneau states that he discussed possible sentences with Sam as early as their first meeting on May 3, 2013.  (Doc. 432 at 1–2.)  At that meeting, Charbonneau claims that he went over the statutory maximum and minimum prison sentences and then "opined" that he thought Sam was facing a Sentencing Guidelines range of between 262–327 months and 151–188 months depending on a number of different variables that Charbonneau could not precisely account for until he received discovery.  (*Id.*)  Charbonneau reviewed with Sam his potential sentencing range again when they met on June 7, 2013, and July 23, 2013, the morning of the change of plea hearing.  (*Id.* at 4–6.)  Charbonneau's Affidavit reveals that Sam was aware of a variety of different sentence ranges he faced when he entered

31

into the Plea Agreement and pleaded guilty.  *See Puglisi v. United States*, 586 F.3d 209,

214–15 (2d Cir. 2009) (citing *Chang v. United States*, 250 F.3d 79, 84–86 (2d Cir. 2001)

(holding that a court can, within its discretion, dispose of § 2255 claims alleging

ineffective assistance of counsel based on the facts, which could be independently

corroborated, alleged in a detailed affidavit filed by the allegedly ineffective counsel)).

Furthermore, statements made by Sam while under oath at the change of plea

proceeding conclusively establish that Sam was aware of the sentencing exposure he

faced.  Sam stated under oath that there had been no promises or representations to

induce him into pleading guilty made by anyone outside of what was expressly stated in

the Plea Agreement, that he had gone over the Sentencing Guidelines with Charbonneau,

and that no one had "made any promises or predictions as to what sentence [he was]

likely to receive."  (Doc. 142 at 11:4–14.)  Sam also acknowledged that the Court

maintained sole discretion to determine his ultimate sentence and that the Court could

impose a sentence up to the statutory maximum of 40 years.  (Doc. 142 at 11–12.)

"Solemn declarations in open court," such as these, "carry a strong presumption of

verity," that will not be cast into doubt by "[t]he subsequent presentation of conclusory

allegations unsupported by specifics," such as the ones made in Sam's Motion.  *Santana*,

2005 WL 180932, at *6 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).  Such

"subsequent presentation[s] of conclusory allegations unsupported by specifics [are]

subject to summary dismissal, as are contentions that in the face of the record are wholly

incredible."  *Id.* (emphasis omitted); *see also Stewart v. Greene*, No. 05 Civ.

0566(WHP)(THK), 2009 WL 4030833, at * 3 (S.D.N.Y. Nov. 19, 2009) ("Self-serving,

conclusory allegations are insufficient to establish ineffective assistance of counsel."
(citing *United States v. Torres*, 129 F.3d 710, 715–17 (2d Cir. 1997))).  Based on Sam's
admitted knowledge of the mandatory maximum and minimum sentences tied to the
crime he pleaded guilty to committing, Charbonneau's Affidavit, and the record of the
change of plea hearing, it is clear that Sam was aware of the sentencing possibilities at
the time he entered the Plea Agreement and when he pleaded guilty.

 Finally, assuming *arguendo* that Sam did not know about the actual sentencing
possibilities, Sam has failed to show that if he had been provided with accurate
information about his potential sentence, he would have gone to trial.  In other words,
Sam has failed to satisfy the prejudice component of the two-part *Strickland* test.  While
the Second Circuit "has not adopted mechanistic rules for determining whether an
adequate showing of prejudice has been made" in the plea agreement context, it has
pointed to a number of factors that can help indicate "whether a reasonable probability
exists that absent counsel's error, the outcome of the proceeding would have been
different."  *Arteca*, 411 F.3d at 321; *see Guerrero v. United States*, No. 08 Civ.
2880(LTS), 2012 WL 423348, at *6 (S.D.N.Y. Feb. 8, 2012) (applying the factors
outlined in *Arteca*).  The Court in *Arteca* pointed to four factors that indicated the
defendant would have still entered the plea agreement even if counsel had failed to
provide the petitioner with accurate estimates of his sentence range.  *Arteca*, 411 F.3d
at 321.  These factors included the petitioner pleading guilty when (1) he knew "the plea
agreement's estimate of his applicable Guidelines range might be incorrect" and that "the
court could impose a sentence outside [of any estimated] range up to the statutory

maximum"; (2) he knew he would lose the "three-level reduction from his base offense level for acceptance of responsibility" if he had proceeded to trial; (3) he knew the government had a strong case against him; and (4) he knew that absent the plea agreement, "the government would presumably have been free to prosecute [him] on any open counts against him, possibly resulting in a sentence exceeding even the statutory maximum for the offense to which [he] ple[a]d[ed] guilty." *Id.* at 321–22.

All four of these factors are present in Sam's case. First, there was no estimated Guidelines range in the Plea Agreement. This and the fact that Charbonneau had presented Sam with a number of plausible Guidelines ranges should have indicated to Sam that some or all of those sentencing estimates were indeed just estimates. Furthermore, in the Plea Agreement itself and at the change of plea hearing, Sam stated that he knew the Court was not bound by any of the estimated sentencing ranges he had discussed with Charbonneau. (Doc. 142 at 11; Doc. 131 at 4, ¶ 12.) Second, Charbonneau advised Sam that if he did not plead guilty, then Sam would likely lose the three-level reduction from his base offense level for acceptance of responsibility. (Doc. 432 at 6.)

Third, and perhaps most importantly, Sam knew that there was a strong case against him. The government's evidence against Sam is fairly described as overwhelming. It included two controlled purchases of heroin directly from Sam, (PSR at 8, ¶ 25; *id.* at 9, ¶¶ 33–34); the likely testimony of numerous cooperators, (*id.* at 9–14, ¶¶ 37–71); a confession by Sam, (*id.* at 9, ¶ 34); a search of Sam's residence that yielded part of a firearm, ammunition, heroin, digital scales, and $45,000 in currency, (*id.* at 9, ¶

36); and the seizure of a second firearm, which had been stolen, from a vehicle in which Sam was a passenger, (*id.* at 6, ¶¶ 16–18). Fourth, Sam knew that absent the Plea Agreement, he faced being charged with additional counts that would increase his sentence. (Doc. 432 at 6.)

The presence of these five factors outweighs Sam's Affidavit that states that absent Charbonneau's erroneous sentencing estimates, he would have gone to trial. (Doc. 426-4 at 3, ¶ 5.) In the Second Circuit, "a self-serving and conclusory statement of this kind is insufficient in itself to show prejudice in the context of guilty pleas." *Arteca*, 411 F.3d at 322. In the face of the overwhelming evidence of Sam's guilt, Sam has not established that the result would have been different if Charbonneau had not erred in his sentencing estimates.

### C.    Failure to Investigate

In his second claim, Sam argues that Attorney Charbonneau provided ineffective assistance of counsel at sentencing, because he "failed to conduct a proper investigation into . . . Sam's prior conviction[s]" when calculating Sam's CHC for purposes of determining his Guidelines sentence range. (Doc. 426-3 at 9–10.) A defendant has a right to effective assistance of counsel at sentencing. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385–86 (2012). This is because, "[e]ven though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because 'any amount of [additional] jail time has Sixth Amendment significance.'" *Id.* at 1386 (second alteration in original) (quoting *Glover v. United States*, 531 U.S. 198, 203 (2001)). At sentencing, an attorney will only

be found to have provided ineffective assistance of counsel for failure to investigate "when counsel fails to 'uncover and present voluminous mitigating evidence at sentencing.'" *Polanco v. United States*, Nos. 11 Civ. 3852(WHP), 05 Cr. 437(WHP), 2012 WL 4785067, at *6 (S.D.N.Y. Sept. 28, 2012) (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

Sam claims that if Charbonneau had adequately investigated Sam's 2001 conviction (PSR at 19, ¶ 90), Charbonneau would have been able to establish that the 2001 offense should not have been included in his criminal history score, because it occurred more than 10 years prior to the "commencement of the instant offense," (USSG § 4A1.2(e)(2)). (Doc. 426-3 at 10–11.) This claim is not supported by the record, because Charbonneau actually made this argument in both the Objection to the draft PSR (Doc. 432-1 at 8) and in the Sentencing Memorandum (Doc. 228 at 8). As Charbonneau pointed out in his Sentencing Memorandum, however, this argument is undercut by a strict reading of USSG § 4A1.2(e)(2). (*Id.*) Charbonneau explained that under a strict reading of § 4A1.2(e)(2), "the critical date," for determining which past offenses are counted as occurring within the 10-year period, "is the date on which the sentence was imposed." (*Id.*) The Court adopted this reading. Sam's 2001 offense was properly counted, therefore, in his criminal history score, because he was sentenced within 10 years of the commencement of the instant offense.

Sam, nonetheless, argues that if Charbonneau had investigated further into his 2001 offense the result would have been otherwise. Sam states that he "was charged with possessing a pistol [without] a permit," on April 23, 2001, and that he later "entered a

plea of guilt[y] to that chrage [sic] and was sentence[d] to two-years A.R. probation and

community service."  (Doc. 426-3 at 11.)  "A.R. probation" is a Connecticut deferred

sentence program known as the Accelerated Pretrial Rehabilitation Program (AR).

Judicial Branch of the State of Connecticut, *Accelerated Rehabilitation*, (Nov. 2014),

https://www.jud.ct.gov/Publications/CR137D.pdf.  This fact seriously undercuts Sam's

argument that Charbonneau did not adequately investigate, because Charbonneau argued

that Sam received a deferred sentence for the 2001 offense in both the Objection to the

draft PSR (Doc. 432-1 at 8) and in the Sentencing Memorandum (Doc. 228 at 8).  Further

investigation would not have enabled Charbonneau to prove that the 2001 offense should

not have been included in his criminal history score, because further investigation would

have only confirmed what Charbonneau already knew.

Sam appears to argue that the deferred sentence he received through Connecticut's

AR program was the sentence imposed for the 2001 offense.  This is not the case.  A

deferred sentence is one of a list of "alternatives to incarceration" that "'provide an

offender with an opportunity to avoid a criminal conviction.'"  *United States v. Leitch*,

Nos. 11–CR–00609 (JG), 11–CR–00457 (JG), 11–CR–00039 (JG), 2013 WL 753445, at

*12 (E.D.N.Y. Feb. 28, 2013) (quoting ABA Justice Kennedy Commission, Reports with

Recommendations to the ABA House of Delegates 10 (2004)).  In a deferred sentence the

charge is tolled, and if the offender complies with the terms of the deferred sentence, then

the charge will be dropped.  Probation, on the other hand, is a noncustodial punishment

handed down by a court as the result of a criminal conviction.  *Id.*  ("[W]hen a judge

chooses between a prison term and probation, she is not choosing between punishment

and no punishment.  Probation is less severe than a prison term, but both are punishment.").  Sam received a deferred sentence.  His 2004 sentence for the 2001 offense, therefore, could not have been for a probation violation because Sam had neither been convicted nor sentenced for the 2001 offense.  Sam's argument, therefore, is meritless.

Finally, it is worth noting that Sam's citation to the record of the sentencing hearing does not support his argument.  As stated above, Attorney Charbonneau admitted at the sentencing hearing to initially having "seriously miscalculate[d] the defendant's criminal record."  (Doc. 267 at 43–44.)  After receiving the PSR and realizing the errors in his calculations, Charbonneau stated he corrected his errors and explained to Sam why he had initially miscalculated Sam's criminal history score.  (Doc. 432 at 6–7.)  Charbonneau's errors were not the result of a failure to sufficiently investigate.  Rather Charbonneau's errors were the result of "miscalculating [the] time period and misreading concurrent/consecutive sentences imposed on Defendant's 2001 and 2003 Connecticut convictions."  (*Id.*)  Charbonneau admits that he "had under-calculated Defendant's point assessment by 4 points."  (*Id.* at 7.)  This error, however, in no way impacted Sam's sentence, because Charbonneau corrected the error prior to submitting his Objection to the Draft PSR and his Sentencing Memorandum.  His arguments in those documents clearly show that at that time Charbonneau had a clear understanding of how Sam's Guidelines sentence range had been calculated.  Sam's second claim should be dismissed, therefore, because he has not demonstrated how Charbonneau failed to sufficiently investigate Sam's prior convictions.

## Conclusion

Based on the foregoing, I recommend that Sam's § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Doc. 117) be DENIED.  Furthermore, I recommend that the Court deny Sam an evidentiary hearing.  A hearing is only warranted when the petitioner's motion "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013) (citing *Machibroda v. United States*, 368 U.S. 487, 494 (1962)).  Sam has failed to carry his burden in this case relying almost exclusively on self-serving conclusory accusations that are contradicted by the record.  *See Arteca*, 411 F.3d at 322.

A certificate of appealability, in a § 2255 proceeding, may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Under this standard, a certificate of appealability will not issue unless reasonable jurists could debate whether the petition should have been resolved in a different manner, or the issues are "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation omitted).  Sam does not satisfy this standard.  Accordingly, I further recommend that a certificate of appealability be DENIED.

Dated at Burlington, in the District of Vermont, this 8th day of December, 2016.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

39

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).